INTERSTATE LAND CO. *v.* MAXWELL LAND GRANT CO.

MAXWELL LAND GRANT CO. *v.* PRETECA *et al.*

*(Circuit Court, D. Colorado.  December 20, 1889.)*

PUBLIC LANDS—GRANTS TO COLONIZERS—CONSTRUCTION—CONDITIONS.

Act Tex. March 24, 1825, provided for the setting apart of tracts of land for colonization, and stated how much land should be given to the colonizers, and how much to each settler.  A Mexican land grant issued under this law assigned to certain colonizers a large tract of land, but declared that the state retained the right of property over all the surplus land in the tract which should remain after laying off the land belonging to the colonizers and their settlers.  The colonizers agreed to establish a certain number of settlers on the tract within a given time, but they failed to do so.  *Held,* that no title passed to the colonizers, the grant not being a present conveyance subject to defeasance, but a contract to convey on performance of a condition precedent, which was never fulfilled.

In Equity.

On demurrer to bill and demurrer to cross-bill.

*John L. Jerome,* for complainant.

*C. E. Gast* and *J. M. John,* for defendants.

BREWER, J.  The single question in these two cases arises upon what is known as the "Beales Grant,"—a grant made in the year 1832 by the governor of the state of Coahuila and Texas.  The petition and grants are as follows:

"Petition and grants to Jose Manuel Royuela and John Charles Beales, for the year one thousand eight hundred and thirty-two and thirty-three.  To His Excellency, the Governor of the State of Coahuila & Texas—Sir: The citizen Jose Manuel Royuela, a native of Saltillo, and there married, and John Charles Beales, a native of England, settled in Mexico, and there married to a Mexican subject, having children, with all due respect represent to your excellency:  That being very desirous of augmenting the population, wealth, and power of the Mexican nation, and at the same time of affording to a certain number of virtuous and industrious families the means of acquiring an honorable subsistence, by cultivating a tract of land in the ancient province of Texas, and being, moreover, acquainted in full with the law of colonization passed by the honorable legislature of this state on the twenty-fourth of March, one thousand eight hundred and twenty-five, by which ' *empresarios* ' or colonizing contractors are allowed to undertake to colonize under the conditions and stipulations by said law prescribed, and being anxious to form an establishment that may be useful to a new colony, and at the same time beneficial to the state, on account of the advantages to accrue thereout:  We pray your excellency to accept us as such *empresarios* or colonizing contractors, and to permit us to introduce into this state, within the time that may be stipulated, two hundred Catholic families, of moral and industrious habits, and for the object your excellency will be pleased to grant us the tract of land included within the following limits, viz.:  Beginning at a land-mark set up on a spot whereat the thirty-second degree of north latitude is crossed by the meridian of the hundred and second degree of longitude west from London, said spot being at the south-west corner of the grant petitioned by Col. Reuben Ross; from thence, proceeding west along the parallel of the thirty-second degree of latitude, as far as the eastern boundary of New Mexico; from

thence, running north on the boundary line between the provinces of Coahuila & Texas and New Mexico, as far as twenty leagues of the river Arkansas; from thence east, to the meridian of the hundred and second degree of longitude, which is the western boundary of the grant petitioned for by the said Col. Reuben Ross; and from thence proceeding south as far as the place of beginning. Your petitioners, as *empresarios*, pray for this grant on the said conditions that it was formerly given to the late Stephen Julian Wilson, whose term of six years is about to expire, on the twenty-sixth day of May in this year, without the conditions of the grant having been fulfilled. Besides the conditions which are required by the colonization law of the state, the *empresarios* and their settlers agree to observe the constitution of the Mexican nation, and the private constitution of this state, as well as the general and local laws that have been or shall be hereafter promulgated. They further bind themselves to comply with the conditions on which this petition is granted, and to take up arms in defense of the rights of the nation against the savage Indians, or any other enemies that may attack the country, or in any manner attempt to alter its form of government, or to disturb the public tranquility; and, finally, to prevent the inhabitants of the United States of North America from trading with the said Indians, and providing them with arms and ammunition in exchange for horses and mules. Wherefore we pray your excellency to be pleased to grant this respectful petition, which we shall consider as a favor conferred on us. Dated at Saltillo the thirteenth of March, one thousand eight hundred and thirty-two.

[Signed]                                   "JOSE MANUEL ROYUELA.
                                           "JOHN CHARLES BEALES.

### "CONDITIONS OF THE GRANT.

"Terms on which the supreme government of the state accept the proposal of the citizens Jose Manuel Royuela and John Charles Beales, for colonizing certain land with two hundred foreign families such as are not excepted by the law of the sixth of April, one thousand eight hundred and thirty.

"Article 1. The government accepts the proposal made in the foregoing petition, as far as it is conformable with the laws of colonization passed by the honorable congress of the state on the twenty-fourth of March, one thousand eight hundred and twenty-five, and consequently assigns to the petitioners the tract of land included within the following limits, that they may establish thereon the proposed colony: It shall begin at a land-mark which shall be set up on the spot where the parallel of the thirty-second degree of north latitude crosses the meridian of the hundred and second degree of longitude west from London, said spot being at the south-west corner of the grant petitioned for by Col. Reuben Ross; from thence it shall proceed along the parallel of the thirty-second degree of latitude, as far as the eastern limit of New Mexico; from thence it shall ascend north, on the boundary line between the provinces of Coahuila & Texas and New Mexico, as far as twenty leagues of the river Arkansas; from thence it shall run east to the meridian of the hundred and second degree of longitude, which is the western boundary of the grant petitioned for by the said Col. Reuben Ross; and from thence it shall proceed south as far as the place of beginning.

"Art. 2. Though the boundaries of the tract set forth in the preceding clause are those assigned to Stephen Julian Wilson, in a grant passed by this government on the twenty-seventh of May, one thousand eight hundred and twenty-six, yet this circumstance has not been considered an impediment to the entering into the present contract, inasmuch as the time allotted to the said Wilson for the completion of said enterprise will (expire) in the month of May of this present year, without his having to this day performed the same, or any part whatsoever. But if, however, in the short time that has to elapse,

any number of the families of that *empresarios* should present themselves, then, and in that case, the present grant shall, with due respect to the part or parts performed by the first grantee thereof, be null and void to all intents and purposes.

"Art. 3. In consideration of the grant hereinbefore specified, the *empresarios*, or contracting parties, agree to introduce and settle, on their own account, two hundred foreign families, conforming themselves as well to the general law of the republic as to the laws of the state in this behalf provided.

"Art. 4. All lands whatsoever held under legal titles, that may be included within the limits designated in article first, shall be respected by the colonists who shall hold under this contract, and it shall be obligatory on the part of the *empresarios* to see to the observance of this clause.

"Art. 5. The state retains to itself the right of property over all the surplus lands which shall remain of this grant, after laying off those which belor ; to the *empresarios* and their settlers, according to the laws in that behalf provided.

"Art. 6. In conformity with article 8 of the law of colonization hereinbefore referred to, the *empresarios* are bound to introduce the stipulated number of two hundred families within the term of six years, which shall be computed from the date hereof, under the penalty of being debarred from all the privileges and advantages afforded by the said law.

"Art. 7. It shall be obligatory on the *empresarios* not to introduce or suffer to remain in the colony men guilty of atrocious crimes, or of bad conduct; as also to endeavor that no person whatsoever shall carry on traffic in arms and ammunition with the barbarous tribes of Indians, in exchange for horses and mules.

"Art. 8. Whenever there shall be a sufficient number of men, the national militia shall be duly organized and regulated, according to the laws of the state in that respect provided.

"Art. 9. The colony shall be regulated by the person whom this government shall appoint to allot the respective settlements or possessions, and he shall duly observe the laws on colonization in force throughout the state, the general law of the eighteenth of August, one thousand eight hundred and twenty-four, and likewise the instructions to commissioners which have been appointed by the honorable congress, taking care to afford protection within the limits of the colony to such persons only as shall be approved of by the *empresarios.*

"Art. 10. All official communications, instruments, and other public documents emanating from the colony must be written in the Spanish language.

"Art. 11. In reference to all matters not provided for or expressed in these articles, the *empresarios*, or the new settlers holding under them, shall abide and be governed by the federal constitution and the laws of this state.

"And his excellency, the governor of the state, as also the citizens Jose Manuel Royuela and John Charles Beales, having agreed in the articles of this contract to grant, and bound, respectively, to the observance and performance thereof, afterwards signed the same before me, the undersigned secretary of this government. And having been directed to give the *empresarios* this certified copy of all the documents relating to the grant, that they may serve them as security and as formal title (or as a title in form) thereto, the originals will, according to law, remain filed and recorded in the secretary's office, under my charge.

"Dated City of Leona Vicario, the fourteenth day of March, one thousand eight hundred and thirty-two. [Signed] JOSE MARIA DE LETONA.
"JOHN CHARLES BEALES.
"JOSE MANUEL ROYUELA.

"SANTIAGO DEL VALLE, Secretary.

"The foregoing is copied from the original documents filed and recorded in the secretary's office under my charge, whence it was ordered taken by his excellency the governor.

"City of Leona Vicario, the fourteenth of March, one thousand eight hundred and thirty-two.

[Signed] "SANTIAGO DEL VALLE, Secretary."

The same year of the grant, and on October 11th, Royuela conveyed by deed to Beales. He remained the owner until his death, in 1879. He disposed of his property by will made in 1873, and by sundry conveyances from his devisees the title has passed to the complainant in the one suit, and the cross-complainant in the other, the Interstate Land Company. The question is presented by demurrers, so that the genuineness and validity of the documents are not open to question. The contention on the one side is that this was a grant passing title subject to defeasance; that the grantor never insisted upon any defeasance, and, indeed, could not, because before the time within which the conditions subsequent were to be performed the state of Texas had revolted from the Mexican government, and established an independent nation of its own, and that by this action performance of the conditions was rendered impossible. On the other hand, the contention is that the grant was in the nature of a float; that by it certain outboundaries of a large tract were designated, within which the grantees, upon performing certain actions, would obtain perfect title to prescribed amounts of land, and that never having performed any of the conditions, or thus paid any of the consideration, no title was ever vested in the grantees to any portion of the land. The area of this tract, as stated by counsel, is over 60,000,-000 acres. The fact that arrests attention at the outset is that the claim of title to this tract, an empire in itself, has remained so long unasserted. For over 50 years it has rested quietly at peace with all the world, and all the world at peace with it. The grantee and single owner lived for 47 years after receiving the grant. Litigation, at great expense, through many years, passing to the supreme court of the United States, has been carried on respecting large bodies of land within this grant, claimed on other and independent titles, and now for the first time the courts are asked to pass upon this grant. It would seem as though the grantee did not understand the grant to be other than a float, as claimed. While, of course, this does not determine the legal effect of the instrument, it is certainly significant as interpreting the understanding of the parties, and it is familiar that oftentimes the conduct of parties to a contract has great weight in determining the real meaning of doubtful words or phrases of it.

Again, it appears from article 2 that the tract in question was one assigned to Stephen Julian Wilson in a grant of May 27, 1826, and an examination of the terms of that grant shows that it was substantially the same as this. By that, as by this, a term of six years was given for the performance of the contract, which term had not expired; and yet, as stated in article 2, this fact was not supposed to restrict the power of the government to make this concession. Yet if, as claimed, these grants

were deeds with conditions subsequent, title passing subject to defeasance, we should scarcely expect a second grant before actual forfeiture of the first. And in the latter part of article 2 it is provided that if, in the short time to elapse before the expiration of the six years. any number of the families of that *empresario* should present themselves, then this grant, with respect to the part or parts performed, shall be null and void. In other words, this contemplates that the introduction of a number of families by the first grantee, Wilson, would give him and them title to portions of the grant, a title not acquired until such performance, —a view of the meaning of the contract consistent with that claimed by the demurrant, and opposed to that insisted upon by the complainant.

But these are preliminary matters. We must look to the instrument itself, and to the law under which the concession was made, to determine its real meaning; and, noticing the first article of the grant,—the article which may be considered as most nearly like the granting clause in an ordinary deed,—we find that the language is, that the government "assigns" to the petitioners the tract of land included within the following limits, that they may establish thereon the proposed colony. Now, the word "assign" may mean "convey," although it is not the ordinary word used in respect to land transfers, or it may mean a setting apart of the land as a tract upon which the petitioners can perform their proposed colonization. That the latter is the true meaning is indicated by the purpose for which the land is expressly assigned, to-wit, as a place for the proposed colony. The language is not, granted on condition that they establish a colony, but assigned as a place where they may establish a colony; and, in what may be considered the recital preliminary to the grant, we find the articles are declared to be the terms on which the supreme government accepts the proposal for colonizing certain lands with 200 foreign families. So the colonization was the object of the contract, and it must be assumed that no more rights were intended to be conveyed than those which resulted from colonization.

Again, by article 4, it is provided that all lands within those limits held by legal titles should be respected by the colonists who held under this contract. True, land previously conveyed would, as a matter of law, be excepted from the grant; but the article also speaks of this as a contract, and implies that colonists under the petitioners would acquire title to some portion of the tract. Of course, if this was a grant passing title to the grantees, this article was unnecessary, and it is significant as calling the instrument a contract, and setting it over against legal title. But article 5 is still more significant, providing that the state retains the right of property over all the surplus lands which shall remain of this grant, after laying off what belongs to the *empresarios* and their settlers. In other words, the state retains title to part of the tract,—a thing impossible, if the instrument was a grant passing title to all. It further implies that only part of the land would belong to the *empresarios* and their settlers, and that it was to be set apart to them in accordance with the laws of the state. This is exactly the idea contended for by the demurrant, —that the instrument, taken as a whole, was simply a designation of a

large tract, with given outboundaries, within which the petitioners could, by colonization, obtain title to certain amounts of land as prescribed by law. All these provisions of the instrument make strongly against the contention of complainant, and, while there are some clauses in the instrument which make in favor of this contention,—as, for instance, the frequent use of the word "grant," the specification in article 3 that in consideration of the grant the *empresarios* agree to introduce and settle 200 foreign families, and the provision that a certified copy of all of the documents relating to the grant shall be given to the *empresarios* to serve them as security and as formal title,—yet if, taking the instrument as a whole, there be conflicting provisions, and the real meaning by reason thereof be doubtful, the familiar rule applicable to all concessions from a government is that the concession or grant is to be construed strictly against the grantee, and in favor of the government, grantor. *U. S.* v. *Cattle Co.*, 33 Fed. Rep. 323. So, if inquiry was limited to the instrument itself, it would have to be adjudged that it was not a grant passing title, but a designation and setting apart of a tract within which the petitioners might, by performing certain acts, acquire title to some land.

But we are not limited to the instrument itself. It is made in pursuance of the law of the state, and that law must be examined in determining the meaning of the instrument. This would be the general rule, and, in addition, this grant, in terms, refers to the law as fixing the rights of the petitioners. The first article declares that the government accepts the proposal as far as conformable with the laws of colonization passed by the honorable congress of the state on the 24th of March, 1825. Thus the particular statute which we are to examine is expressly referred to, and by implication made a part of the contract. Articles 3, 5, 6, 8, and 9 also contain references to the statute, and article 11 directly declares that in reference to all matters not provided for or expressed in those articles the *empresarios* or the new settlers shall abide and be governed by the constitution and laws. The act of March 24, 1825, referred to, consists of 48 articles. It may be found in Rockwell's Spanish and Mexican Law, p. 641. It purports to be a colonization law, and the first few articles refer simply to the admission and rights of foreigners. Article 8 is as follows:

"The projects for new settlements, in which one or more persons offer to bring, at their expense, one hundred or more families, shall be presented to the government, and, if found conformable with this law, they will be admitted; and the government will immediately designate to the contractors the land where they are to establish themselves, and the term of six years, within which they must present the number of families they contracted for, under the penalty of losing the rights and privileges offered in their favor, in proportion to the number of families which they fail to introduce, and the contract totally annulled if they do not bring, at least, one hundred families."

Article 11 defines the unit of measurement. Articles 12, 13, and 14 read thus:

"Art. 12. Taking the above unity as a basis, and observing the distinction which must be made between grazing land, or that which is proper for raising stock, and farming land, without the facility of irrigation, this law grants to

the contractor or contractors, for the establishment of a new settlement, for each hundred families which he may introduce and establish in the state, five *sitios* of grazing land, and five labors at least, the one-half of which shall be without the facility of irrigation; but they can only receive this premium for eight hundred families, although a greater number should be introduced, and no fraction whatever less than one hundred shall entitle them to any premium, not even proportionally.

"Art. 13. Should any contractor or contractors, in virtue of the number of families which he may have introduced, acquire, in conformity with the last article, more than eleven square leagues of land, it shall nevertheless be granted, but subject to the condition of alienating the excess within twelve years; and if it is not done, the respective political authority shall do it, by selling it at public sale, delivering the proceeds to the owners after deducting the costs of sale.

"Art. 14. To each family comprehended in a contract, whose sole occupation is cultivation of land, one labor shall be given. Should he also be a stock-raiser, grazing land shall be added to complete a *sitio;* and, should his only occupation be raising of stock, he shall only receive a *superficie* of grazing land equal to twenty-four million square bars."

Articles 15 and 16, like article 14, refer to amounts of land to be given. On September 4, 1827, a series of instructions to commissioners appointed by the legislature for the partition of lands among the new colonists was issued by the government. See Rockwell's Spanish and Mexican Law, 649. Among them, article 4 reads thus:

"Art. 4. He shall issue, in the name of the state, the titles for land, in conformity with the law, and put new colonists in possession of their lands, with all legal formalities, and the previous citation of adjoining proprietors, should there be any."

And article 24, thus:

"Art. 24. He shall take special care that the portions of land granted to the colonists by articles 14, 15 and 16, shall be measured by the surveyors with accuracy, and not permit any one to include more land than is designated by law, under the penalty of being personally responsible."

Reference in these articles to articles 14, 15, and 16 is to articles in the colonization law. Now, article 8 of the law quoted above, prescribes what the government will do when the petition of an *empresario* for colonization is presented. If found conformable with this law, the government will immediately "designate" to the contractors land whereon to establish themselves. This, of course, does not mean that the government will grant them the land, but simply that it will select and designate the place where a colony may be settled. So that when we find, in the first article of the grant, that the government assigns a given tract to the petitioners for the establishment of a colony, the assignment is made by virtue of this article 8 of the law, and means simply the selection of a place for the colony. Passing on to article 12, we find what the government will give to the *empresario* specifically declared, to-wit, for each hundred families five *sitios* of grazing land and five labors, at least the one-half of which shall be without the facility of irrigation. This article makes plain the meaning of article 3 of the grant, and shows that that means simply that, in consideration of the setting apart of this

large tract of land, the petitioners agree to introduce and settle on that land 200 foreign families. Articles 12 and 13 together provide what shall be given to the *empresario* who introduces 800 families, and receives more than 11 square leagues of land. This last article shows a clear intent that no party should obtain title to more than 11 square leagues, no matter what services in colonization he may render to the state. Articles 14, 15, and 16 provide what the individual settlers are to receive, and sections from 12 to 16, inclusive, explain fully the meaning of article 5 of the grant, which declares that the state retains title to all the surplus land within the grant after laying off that which belongs to the *empresarios* and their settlers. Thus the law makes plain the meaning of the contract, and shows that it was not a conveyance passing title. In other words, the grant must be presumed to have been made in pursuance of the law, and to be limited by the terms of the law. Indeed, it is doubtful whether a grant made in excess of the authority given by the law would be valid. This grant, in terms, refers to the law under which it was made, and shows that it was made in pursuance of the authority conferred by that law, which provides that the government will select a tract of land upon which the *empresario* may establish a colony, and that, if he does, he will be paid in land at a fixed rate, and that the colonists that he introduces will also receive definite amounts of land. This grant, made thus in pursuance of this law, means just what the law says it may mean, and was simply a designation of a tract within which the petitioners might establish a colony. It of itself passed title to no portion of the land to them.

In *Spencer* v. *Lapsley*, 20 How. 270, the supreme court used this language in respect to the law under which this grant was made:

"The contract of an *empresario* obliged him to introduce colonists into a specific district. The colonist having a family was entitled to one league of land, of a particular quality, for which he paid a small sum to the government. The *empresario* was paid five leagues and five labors for every one hundred families introduced. Of course, the excess of land within the limits of the colony, after supplying the colonists and the *empresario*, remained to the government. The commissioner of distribution was an officer of the government, who superintended the fulfillment of the contract by the *empresario*. He ascertained the character of the colonists, allotted to them and the *empresario* their shares of land, and for that purpose appointed surveyors, received returns of survey, and executed the final titles."

—Further strengthening this view of the meaning of the grant is article 4 of the instructions quoted *supra*, which provides that the commissioners shall issue the titles for land, and this simply carries out the idea, running through the law, that no title passed to any of the land until the establishment of the colony. But, further, the law which we have been considering was the law of the state of Coahuila and Texas, which was passed in pursuance of a decree of the Mexican government of August, 1824, which will be found in Rockwell's Spanish and Mexican Law, p. 451. In that general decree of the nation, by the twelfth article, it is provided that no one person shall be allowed to retain the ownership of more than 11 leagues square. Obviously, one of the

states, acting in pursuance of that decree, would not have provided for a larger grant.

From these various considerations, it seems to me clear that the grant in controversy was not intended to be, and was not, a conveyance subject to defeasance, but that it amounted only to a designation and setting apart of the tract as a tract within which the petitioners could establish a colony in conformity to the colonization law, and upon such establishment obtain title to a fixed quantum of land within the tract. As there is no pretense that one was ever established, no title to anything ever passed. It follows that the complainant holds nothing by virtue of this so-called grant, and the demurrers must be sustained, and it is so ordered.